Case 17-3496, Wilson-Davis & Co Inc v. James Mirgliotta. Oral argument, 15 minutes per side. Mr. Van Wagner for the appellant. Thank you. Good morning. I had requested three minutes. It appears to be the number that everyone likes today, so I, for rebuttal. You may choose your number. May it please the court, I, Mark Van Wagner, together with my colleague Craig Perry, we represent Wilson-Davis, the appellant in this case. The sole issue on this appeal is whether the district court properly determined that the claims against Wilson-Davis are subject to FINRA arbitration. The district court's determination that Wilson-Davis must submit to arbitration is reviewable de novo. Wilson-Davis does not contend that the lower court made an erroneous finding of fact. Rather, we contend that the district court erred in two ways. Basing its decision on testimony that is incompetent and inadmissible under the federal rules of evidence. And two, that even if that evidence were accepted as proper, the district court erred in applying that evidence to the clear lingual standards for determining arbitrability under the FINRA rules. Based on federal rule of evidence 602 and the controlling cases, the court should reverse the decision of the district court and remand the case to that court with the directive to enter a declaratory judgment that appellees cannot require Wilson-Davis to arbitrate the dispute. Regarding the alleged losses in new market enterprises. The district court decision is inherently erroneous for two specific and plain reasons. Either of which justifies its reversal. First, the district court's decision admittedly relies on inadmissible and incompetent testimony from James Murgliata. And I will come back to this, but let me just say, explain how the case began. Mr. Murgliata, on his own and on behalf of his late wife's estate, filed a claim in arbitration against Wilson-Davis. And it claimed three separate causes. The first were securities of Q Lotus. The second were securities of VGTEL. And the third was a transaction in which Mr. Murgliata sent money out of his own personal account to an account in the Bank of America. I think it's in New York City. As to the first Q Lotus, Mr. Murgliata concedes that that is not arbitrable. There were no transactions of the Q Lotus stock of any kind at Wilson-Davis. As to VGTEL, there were transactions of VGTEL at Wilson-Davis. And we concede that he can arbitrate those. The third is what's at issue today. And the argument originally in the first amended statement of claim was that Wilson-Davis had wired this money directly to another company, New Market Enterprises. Turns out there's no evidence of that. And so as we began to do some discovery on this issue, I began to ask Mr. Murgliata why he thought that Wilson-Davis had anything to do with his separate sending of his own money to an account that was outside Wilson-Davis and had nothing to do. He initially said he had never met the agent who supposedly told him to send it. He didn't know the man when he called on the phone. And then he said the way he knew who it was was because someone else told him. Now, first of all, that shows he had no foundation to say that it was anyone from Wilson-Davis. And secondly, his only means of knowing who it was is inadmissible hearsay. Now, I gathered this in the deposition so that if we had a hearing, I could object to foundation and hearsay and none of it would have come in. But because it was done on the papers before the judge, she looked at this and her determination was, to use her words, she found that Mr. Murgliata believed that it was the representative of Wilson-Davis who told Mr. Murgliata to wire money to this account that has nothing to do with Wilson-Davis. Now, let me say, I'll come back to that, but that's a shorthand of it. Even if that were competent testimony, even if somehow that did not violate the hearsay rule, this dispute would not be arbitrable under the FINRA rules according to the cases that discuss it. And in particular, the Vestax case, which is the Sixth Circuit case on which everyone seems to rely. FINRA Rule 1220 provides that in the absence of an express agreement, and there is none here, a FINRA member like Wilson-Davis can be required to arbitrate a dispute only if the dispute is between a customer and a member or an associated person of a member and, this is important for this matter, the dispute arises in connection with the business activities of the member of the association. All cases cited by both sides, including Vestax and ABAR, which is a Second Circuit case, are in accord with this standard. So let me explain what I mean. The rule says there has to be a dispute, and then it talks about how you deal with it. What is the dispute here? The dispute is about the loss of money in an account somewhere, not at Wilson-Davis. It is in an account where they wired money to Bank of America, and yet they seem to want to argue that that dispute is arbitrable. There may be legal theories by which they could file a case and prevail, but I've looked at all of the cases. Unfortunately, I have them, but we won't read all of them, I hope. But in each and every case, there has been no finding of arbitration, of the need or the right or a command to arbitrate, unless the dispute related to the loss inside a securities account either owned by the member, the broker-dealer, or a broker himself. For example, in the ABAR case, this is what they say. They say, likewise, the FINRA member should anticipate that account holders may avail themselves of the arbitration forum to dispute, quote, transactions arising from the account. The transaction here, of which he complains, did not arise within or because of an account held at Wilson-Davis. Now, let's think about that. Without that common-sense limitation, an account holder could bring any grievance in arbitration. If all they had to have was an account, Mr. Murgliotta walks into Wilson-Davis, one of the brokers says, take the back stairs, it's slippery, he falls, he can't arbitrate that. There has to be some limitation on the right to arbitrate, even if there is an account. And that limitation is that the dispute itself, the damage, the injury, must occur in an account which is held by the member or is held by the broker. And that's the Vestax case. In the Vestax case, there's no question that the broker, that Vestax did not know that money was being put into accounts and that the investors were going to lose money. But what they said, let me just read it to you. Let me pull it up and read it to you because I think it's important. What they say here is, they say there's no question that the investors had little in the way of contractual or transactional relationship with Vestax. Okay, so they had no relationship with the broker. Yet the broker was required to arbitrate. Why? Well, they explain at the bottom of the page. Each one of the investors, however, did establish trading accounts with Davis and Dunn. And Davis and Dunn were the brokers of Vestax, which they say, in which they purchased the securities that the agents recommended to them. So even in Vestax, it is clear from the Sixth Circuit case that unless and until there is an allegation that the dispute is over a loss in an account at the broker or in a rogue agent's, at the broker dealer, in a rogue broker's account, there cannot be arbitration. Now, both of these cases, this one and the Aabar case, is even more clear about this. The Aabar case, poor Mr. Aabar put about a half million dollars into some accounts in City, UK, in England. And those accounts were managed by, there were individuals in New York City at City, NY, New York, who gave him advice that helped to manage these accounts, that talked to him about where things should go. And in the end, he lost about $400 million. He tried to arbitrate against City, New York. And the Second Circuit said, you can't. And the reason for that, they said, was really quite clear. What they said was that he was not a customer. He said FINRA members should anticipate that account holders may avail themselves of the arbitration forum to dispute transactions arising from the account. But there was no account at City, New York. And so the Second Circuit held that he could not force City, New York to arbitrate. Now, we'll take that to this case. I suggest that, and you can read this because it's all in the briefs, but I suggest that even if one thought that one of Wilson Davis's agents said to Mr. Murgliata, oh, go ahead and send that off, it doesn't rise to the level of any sort of loss in an account of Wilson Davis. So Wilson Davis should not have to arbitrate that particular claim that's being made by Mr. Murgliata. So wasn't there an account at Wilson Davis? Yes. Yes. The accounts at Wilson Davis had two things. The accounts at Wilson Davis had the stock of VGTL, which we are prepared to arbitrate. And another account held cash that had been wired in and was then wired back to Mr. and Mrs. Murgliata's personal account. So the fact that you're saying that even if your agent was aware and encouraged this transaction, the money going from one account to Wilson Davis to another account, for the purpose of purchasing this new market stock, that it has to have been done in that account otherwise. Well, all of the cases say, and every one, in every one where there's arbitration, there was a loss in an account held by either the brokerage house or a rogue broker. There is no case in which arbitration was required where the loss was in a separate account somewhere else altogether. Now, I'm not saying you can't come up with a legal theory. The language this is pertinent to is what? The involving or the customer language? Well, the language of the FINRA rule says that you can arbitrate where there is, and I want to quote it, so let me pull it out here, where there is a dispute arising in connection with the business activities of the member of the association. That's the second part of it. The first is the customer. Yes, that's true. A customer and a member or associated person member. I don't know how you can say there's not a customer here. Oh, he is. He's a customer. Okay, so all right, they satisfy the first prong of customer, so you rely on the second prong that it doesn't arise in connection with the business activities. Yes, and what I'm saying is that every case – You say that the loss has to occur at the Wilson Davis account as opposed to the other account. That's not quite what it says. I mean, it says business activities, and, I mean, you're reading into the law that the loss has to occur in the account. That's the only way it can be business activities, and they say business activity is broader than that. Well, FINRA regulates the business activities of securities dealers. The business of securities dealers is the business of buying and selling securities, and I'm not trying to add on. I'm simply saying what I understand the cases to be telling us. They're arguing negligent supervision, aren't they? Yes, and that's not arbitrable. Okay, is that business activities or not? No. Supervision? No. No? No, not unless the dispute arises over a loss that occurred in the securities. I don't see that in the standards, though. I mean, you're adding that, and maybe some of the cases have language to that effect, but I don't see that. I see the two standards of one, customer, two, in connection with business activities. Well, you know, I don't doubt that they're customers because they're customers for the purpose. All right, we're past the customer problem then. Then we're just into business activities. You have a very narrow definition of business activities. No, I may have a slightly different definition of customer. They are customers for what? They were customers for what was purchased and sold in their securities account. Would they be customers if what happened was they had all this money in an account, a Wilson Davis account, and the agent, the Wilson Davis guy, told them to transfer the money to him in order that he could make another investment, and then he went to the Bahamas with it? Yes. Is that arbitrable? Yes, because the loss occurred in an account of Wilson Davis. Well, it occurred once the money was out of the account of Wilson Davis. Well, he stole it out of an account of Wilson Davis. In this one, in this case, the money was wired to Mr. Merliotta. He had it, and there are other parts of this evidence that are fascinating, because he claims Mr. Werbel told him to send it. But whatever that is, it was sent there, and he, on his own volition, wired it out of his own personal account to a Bank of America account. Why should we limit business activities to loss in the Wilson Davis account? I mean, you keep saying that's what it is. Why should we do that? Why should we make that the law of the Sixth Circuit? Because every case that's cited has a loss only in the securities account. Is there a precedent binding on me? I'm sorry? Is there a precedent that's binding on me to so hold? Well, the Sixth Circuit case in Vestax, in which they say. . . Is that the holding of the case? Well, not in my words. . . It's not the holding of the case. I asked you, is there a precedent I have to follow? I guess the answer is no. Well, I don't. . . Hang on. I didn't say no. What I'm doing is pulling it up here. In order to. . . Well, the holding in the Vestax case is that Vestax was required to arbitrate because. . . Remember this. Because its rogue brokers bought and sold securities in their own personal accounts. And so what I'm saying is that was how they found that Vestax was required to arbitrate. They didn't find they were required to arbitrate because their broker told somebody to invest down the street. And so I think that's the holding. I think we have to bring this to a halt. Yes. Thank you. We'll get your rebuttal time. Good morning, Your Honors. May it please the Court. My name is Rob Dubiak and I represent James Murgliata individually and as the administrator of the estate of Betty Murgliata. And Judge Griffin, just to jump right into one of your questions regarding the Vestax case. In Vestax, this circuit had previously held that, quote, a dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business. In Vestax, customers of two registered representatives of Vestax sought to compel Vestax into arbitration for alleged poor investment advice. And for failure to supervise its agents. The investors never established an account with Vestax, nor had they purchased any securities through Vestax. Vestax did not receive any commissions from the transactions in question. That being said, this circuit held that a customer relationship can exist even where the broker-dealer was not aware of transactions placed through other broker-dealers or, in this case, other accounts. Wilson Davis originally brought this action in federal court seeking a determination that the Murgliatas were not customers of theirs. And as such, the dispute was not properly before FINRA for adjudication or subject to the FINRA arbitration procedures. Wilson Davis' original argument was premised on the fact that the allegations in the statement of claim before FINRA were that the Murgliatas' accounts were opened without their full knowledge and consent, and certain documents were forged. Wilson Davis argued that if the Murgliatas had not given their full knowledge and consent, and there were forged documents, that they may not have known they were customers, and if they weren't customers, they wouldn't be subject to FINRA arbitration. As it turned out, after paper discovery was exchanged and depositions were taken in the lower court case, the evidence was clear that the Murgliatas were customers of Wilson Davis. Lyle Davis, who is the chairman of the board of Wilson Davis and the treasurer of the company, testified at deposition regarding the proper procedures or the procedures used at Wilson Davis to open new customer accounts. He indicated that those procedures were followed in the opening of the Murgliatas' accounts. The procedures included reviewing the Murgliatas' account applications, issuing age suitability letters and non-recommendation letters, obtaining self-directed authorizations for retirement accounts, reviewing driver's licenses, and then issuing account numbers. Each of these steps was followed in the Murgliatas' applications. There's even correspondence that was produced in the case where employees of Wilson Davis, namely Brent Davis, asked for additional information on the Murgliatas' accounts after receiving their initial applications. Brent Davis requested copies of driver's licenses and executed applications which were provided to him. Mr. Lyle Davis testified that the new account application for the Murgliatas were not only reviewed by Christopher Servino, their account representative, but were also reviewed by officers at Wilson Davis, including Lyle Davis himself. Interestingly, Mr. Davis, Mr. Lyle Davis, the chairman of the board, testified at his deposition that, but for this lawsuit, he considered the Murgliatas customers of Wilson Davis. Accounts were opened for James and Betty Murgliata on July 12th and July 19th of 2013, respectively, and Mr. Murgliata testified in his deposition that he was not surprised to receive documents from Wilson Davis because he understood that his 401k money was being transferred from his TD Ameritrade account to Wilson Davis. Both Mr. Murgliata's 401k money as well as his wife's 401k monies were transferred from their TD Ameritrade accounts to Wilson Davis. Wilson Davis sent the Murgliata's account statements each month during the relevant periods of July, August, and September of 2013. Stocks were purchased by Wilson Davis in Mr. Murgliata's account. Mr. Murgliata was contacted by his account representative at Wilson Davis, Christopher Servino, to discuss the wire transfers that are in issue in this case. Mr. Murgliata also testified, quote, All I was doing was following the instructions from Mr. Servino, who was an employee and was the agent of Wilson Davis, and Mr. Larry Werbel, who was my agent. I think there's some question here, though, about whether, in fact, Mr. Murgliata knew that Mr. Servino was involved in regard to the wire transfers. Mr. Servino was the one who called Mr. Murgliata to instruct him on what to do. Edward Durante, the other individual who was part of the criminal conspiracy, had sent Mr. Murgliata an email with specific wire instructions. The email in question specifically said, in essence, You're to go to your bank on Monday afternoon. Wilson Davis will be wiring $560,000 to your personal account. When the money arrives, you're to wire the money to New Market Enterprises. So he received that communication from Edward Durante, and then Christopher Servino called him on the phone just to discuss the actual transfer from Wilson Davis to his personal account to New Market Enterprises. Well, they seem to concede that your clients are customers. So I guess the real question is whether the other requirement is met, whether this is in connection with the members' business. And what they're arguing is that there has to be some sort of loss in the account, not a transfer of money out of the account at someone's direction. Can you address that specifically? Yes. In the Abar case, the central inquiry was the individual claiming an account holder, was a customer of the company. The inquiry in Abar ended at that point. In this case, as you indicated, Judge White, Wilson Davis has conceded that the Mergoliatas were customers of Wilson Davis. After the wire transfer, the Mergoliatas still remained customers of Wilson Davis. They still had their accounts. They still had money in the accounts. They still had stocks in the accounts. They were still receiving account statements. But what Wilson Davis is trying to argue, in essence cherry pick or try to craft out the fact that because the money, after it was wired to their personal account, was wired to New Market Enterprises, that that somehow relieves them of jurisdiction of FINRA. In this case, the dispute, the true dispute is, is Wilson Davis liable to the Mergoliatas for Chris Servino's conduct or for their conduct for either failure to monitor or failure to supervise Chris Servino as their account representative or their failure to monitor and supervise the Mergoliatas' accounts and the transactions and activity that occurred in those accounts? Essentially, it seems to me the real question is, because the Mergoliatas got inserted back into this as the middle man in the New Market Enterprises' transaction, that relieves Wilson Davis of any responsibility for that transaction. That's what they're arguing. However, Chris Servino was part of the criminal conspiracy with Ed Durante and Larry Werbel. The three of them, among others, have been convicted in federal court in New York as part of this criminal conspiracy and they're awaiting sentencing. Chris Servino was an active participant in the fraud. In 401k transactions, money can be transferred out of a 401k account in only two circumstances. If it gets transferred to another 401k account and there's a special designated banking system that handles that transaction separately, there could be no theft, there could be no fraud in that transaction. The only other possibility of what a person can do with 401k money is to have it sent directly to them. Under no circumstance can you direct it to a third party. You can only have it directed to yourself. So the thieves, the criminals, Chris Servino and Werbel and Durante, knew that. They knew that the only way they were going to be able to steal the Mergoliatas' money was if they somehow got the money into their account first and then had it transferred to New Market Enterprises, which was the sham company. So Chris Servino was part and parcel of that. One of our claims is, did Wilson Davis fail to properly monitor and supervise their account representative's activity that led to the theft? And that was part of the business activity question. In Vestax, the court held, quote, a dispute that arises from a firm's lack of supervision over its brokers arises in connection with its business. Judge Gahan held that the evidence on the record in this case was, quote, that the defendants were Wilson Davis' customer with respect to New Market Enterprises and that, quote, the evidence also supports that defendants' claim against Wilson Davis for negligently failing to monitor their accounts and negligently failing to train and supervise its advisors arises in connection with the activities of Servino. Right on point with this court's ruling in Vestax. As the district court correctly determined, there is unambiguous evidence on the record linking Servino and Wilson Davis to monies wired out of Wilson Davis to New Market Enterprises. That was the scam. Your Honor, as I was just indicating, because this dispute is between Wilson Davis and the Murgiatas and whether they have liability to the Murgiatas for the claims alleged, what we're here for today is obviously the jurisdictional issue, and that is should those issues be decided in federal court or in FINRA arbitration. As the Murgiatas were customers of Wilson Davis, the dispute should be heard in a FINRA arbitration, and that is what Judge Gahan ruled. The question of whether the Murgiatas were customers of Wilson Davis does not extend to what transactions Wilson Davis is responsible for because courts have defined the term customer broadly in the FINRA context. By trying to stretch the issue of jurisdiction way beyond its natural scope to include issues of liability and damages which are properly before the FINRA panel, they're misguided. The evidence on the record is clear that the Murgiatas were customers of Wilson Davis. Their claims arose in connection with the business activities of appellant, and accordingly the Murgiatas are entitled to resolve these disputes in FINRA arbitration. In conclusion, the district court's finding that appellant is required to arbitrate the Murgiatas' claims regarding New Market Enterprises is not clearly erroneous based on a complete reading of the record and should be upheld. For those reasons . . . The finding is not clearly erroneous? Is that an issue of law or is it an issue of fact? The review is clearly erroneous on the findings of fact that the judge applied to the law. Okay, but the ultimate conclusion here is an issue of law? Correct. What are the crucial findings of fact that we give the district court deference on under a clearly erroneous standard? Which are those? I'm missing that one. The determination that the issue of whether Wilson Davis failed to monitor the Murgiatas' accounts and failed to properly monitor, train, and supervise Chris Servino was in connection with the business activities. That sounds like an issue of law, not an issue of fact, though, isn't it? Yes. Okay. I'm sorry. I may have misunderstood the . . . Well, I just see the issues here as all issues of law. I mean, you ended by saying it's not clearly erroneous, which is the standard for reviewing issues of findings of fact, but I don't see any particular issues of fact here. I see this as a legal determination of whether under these facts the dispute arises in connection with the business activities of the member. I don't think there's really an issue that they were a customer here. I think that's well settled, but whether these facts satisfy the standard of a dispute in connection with business activities I think is a legal determination. That's all. And I apologize. I did misunderstand the question, but you were absolutely right. I was not arguing that the decision primarily for you is based on the facts of the case. It's the application of the law. Thank you. Thank you, counsel. Rebuttal? Thank you. The great deal of talk about a criminal conspiracy is not in this record, and I'm not even going to object to it, but it's not there. Let me go back, as I said I might, to what the testimony actually was. The first mention of Mr. Servino is on page 15 of the deposition. Did you ever meet Mr. Christopher Servino? No. I've never met him. Did you ever speak with him? Yes. How do you know it's Chris Servino? I remember the name, and Mr. Wuerbel told me to expect a call from him. So it was Mr. Wuerbel who told you it was Chris Servino? Answer, yes. If you wrote a check to New Market Enterprises, I think that's where I wrote the check, question right, was that your decision to do so? Was it not? Answer, I was instructed to do that by Mr. Wuerbel. Well, I'm not sure it was Mr. Wuerbel or Mr. Servino at this time. I'm really not. Question, tell me on the record why you would take instruction from Mr. Servino. Answer, because maybe Mr. Wuerbel told me to. But you can't recall a conversation? No, I can't. And you can't recall if Mr. Servino actually told you to send it anywhere? Can you? Answer, I can't recall. I'm going to ask you to tell me everything you can remember that Mr. Servino told you on the telephone. Answer, I don't recall. That was four years ago. Other than instructions were clear I was getting a phone call from Mr. Servino about the money transfer and the instructions were to send it to New Market. That's all I can tell you. Question, who told you that you were getting the phone call? That was Mr. Wuerbel. And Mr. Wuerbel told you the instructions were to send it? I mean, we have paperwork. Answer, I don't recall. Question, you don't remember? Answer, no. My question, and on the basis of no recollection, you believe that Mr. Servino and Wilson Davis caused you personally to send money to New Market Enterprises? Answer, yes. He had no recollection. Everything that he testified to was not competent evidence and it was given as a result of, even knowing who was coming, was given as something that would be hearsay. So there's no evidence, no competent evidence in the record to tie Wilson Davis to this. But as to the question of the two prongs, let me read to you from Vestax. This is on page 1081. Quote, in other words, there are two conditions that must be satisfied to trigger the NESD, and that's the predecessor to FINRA, arbitration requirement. First, the claim must involve a dispute between either an NESD member and a customer or an associated person and a customer. And second, the dispute must arise in connection with the activities of the member or connection with the business activities of the associated person. And that is why in every case where there's been a dispute, there has been business activities inside an account either held by the member or by a rogue broker. For that reason, we suggest and ask that you reverse the decision, for those two reasons, the decision of the district court. Thank you. Thank you, counsel. The case will be submitted. Clerk, may I call the next case?